IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

    vs.                                               No. CR 18-2212 KG

**JOSE VELARDE-PAVIA**,

    Defendant.

MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendant Jose Velarde-Pavia's (Defendant) Second Motion to Suppress Statements and Evidence and Request for a Hearing Pursuant to *Franks v. Delaware*, filed May 13, 2019, and Defendant's Corrected Second Motion to Suppress Statements and Evidence and Request for a Hearing Pursuant to *Franks v. Delaware*, filed May 16, 2019 (collectively, "Second Motion to Suppress"). (Docs. 113 and 119). The United States filed its response in opposition on May 30, 2019. (Doc. 130). Having considered the record, the briefing, the applicable law, and the evidence, the Court denies Defendant's Second Motion to Suppress.

I.    Background[1]

On June 7, 2018, Roswell Police Department Agent G. Juarez obtained a search warrant for a 2008 white Toyota truck registered to Defendant and to his sister, Arianna Garcia, with a New Mexico license plate number LDN-793. (Doc. 119-1) at 1-3. In his affidavit in support of the search warrant application, Agent Juarez stated he sought permission to search for

---

[1] The Court previously denied Defendant's first Motion to Suppress Illegally Obtained Evidence (Doc. 26) on December 5, 2018. (Doc. 42).

"[c]ontrolled substances . . . namely [m]ethamphetamine," among other related items of interest. (*Id.*) at 3.

Agent Juarez attested that he had "met with a reliable, credible and confidential informant" (CI) who had assisted him and other law enforcement personnel "by providing information, on more than three separate occasions that has led to the recovery of controlled substances." (*Id.*) at 4. Specifically, Agent Juarez attested that the CI "personally witnessed the sale of controlled substances on more than three separate occasions while working for Agents with the Chaves County Metro Narcotics Task Force" and "personally purchased controlled substances for Agents with the Chaves County Metro Narcotics Task Force on more than three separate occasions." (*Id.*) Agent Juarez continued:

> Said informant has provided information which has proven to be truthful. Said informant has never provided false information to the knowledge of Affiant. Said informant has associated with known [m]ethamphetamine sellers and users and is familiar with the appearance of [m]ethamphetamine and how it is packaged and sold.

(*Id.*)

According to Agent Juarez, the CI told him that, within the past 72 hours, the CI saw Defendant selling methamphetamine from his vehicle. (*Id.*) Agent Juarez attested that the CI also told him that Defendant has "several residences where he stashes large amounts of narcotics." (*Id.*)

Furthermore, Agent Juarez attested that, within the last 72 hours, surveillance by Agents revealed that Defendant drove a white Toyota truck with a New Mexico license plate number of LDN-973 from 806 W. 11th Street in Roswell to a residence at 1500 W. Albuquerque Street, also in Roswell. (*Id.*) at 5. Agent Juarez related that Agents observed Defendant outside of his Toyota struck speaking with a female outside the residence at 1500 W. Albuquerque Street. (*Id.*)

Agent Juarez stated Agents also observed that shortly after arriving at 1500 W. Albuquerque Street, Defendant drove the Toyota truck back to 806 W. 11th Street, where the CI purchased methamphetamine from Defendant. (*Id.*) Agent Juarez indicated in the affidavit that the Agents learned from the CI that Defendant "had travelled to an unknown location to pick up methamphetamine." (*Id.*)

Additionally, Agent Juarez attested in the affidavit that "through prior investigation and surveillance" he knew that Defendant's sister lives at 1500 W. Albuquerque Street and Defendant's brother lives at 806 W. 11th Street. (*Id.*) Agent Juarez also attested that the CI told him that "there [were] several firearms in the residence" at 806 W. 11th Street. (*Id.*)

Finally, Agent Juarez states that he knows, through "training and experience," that:

> [I]llicit drug dealers keep a quantity of controlled substances on premises or their person for sales. That illicit drug dealers often consume, ingest, inhale or by some means introduce the controlled substance into their own bodies for personal use and will maintain a supply of drug paraphernalia. That illicit drug dealers often use scanners, surveillance equipment and cellular phones for the detection of law enforcement personnel. That illicit drug dealers will use firearms for the protection of themselves and their product during drug transactions and from other illicit drug dealers and users. That illicit drug dealers will often times use cellular phones and pagers to set up drug transactions both verbally and by text messaging. That illicit drug dealers commonly keep records (paper, electronic or computerized) relating to their drug trafficking activities. That illicit drug dealers often maintain phone books, address books and other records containing names, telephone numbers and addresses of suppliers and purchases of illicit drugs. That illicit drug dealers will often times maintain these types of records on a computer disk, CD, computer internal memory, cell phone or on some other type of electronic storage device. That illicit drug dealers often times amass large amounts of profits derived from their illegal drug trafficking activities and proceeds of such described herein would constitute evidence of drug trafficking. That illicit drug dealers will protect their product / proceeds by concealing it in cryptic locations, in locked storage containers, on their person or on the person of another in close proximity.

(*Id.*)

In a Supplemental Report, that does not appear to have been submitted as part of the warrant application, Agent Juarez detailed the controlled buy:

3

> At approximately [redacted] hours Agents met with the CI at a predetermined undisclosed location and learned the CI had pre-arranged a [redacted] deal of methamphetamine from [Defendant] for the amount of [redacted] at 806 W. 11th. The CI was not in a vehicle. Agent [Lisa] Brackeen searched the person of the CI with no money, drugs or weapons being found. Agents then provided the CI with (HIDTA FUNDS). Agents would provide loose surveillance throughout the entire deal. Agents then followed and observed the CI arrive at 806 W. 11th at [redacted] hours. At around [redacted] hours [Defendant] and [redacted] entered a white Toyota bearing NM-LDN-973 and left 806 W. 11th. I observed [Defendant] driving the truck. I learned from the CI that [Defendant] and [redacted] had went to go get the [redacted] from an unknown location. Agents followed the truck to 1500 W. Albuquerque. Agent Berumen, Agent Arroyo and Agent Salas observed [Defendant] outside the residence. Agents then drove by again and did not observe anyone outside the residence but [Defendant] truck was still parked at the residence. . . . At approximately 1835 hours [Defendant] left the residence of 1500 W. Albuquerque. Agents followed the truck and observed the truck park at [redacted]. Agents then observed the truck leave [redacted] and arrive back at 806 W. 11th at approximately [redacted] hours. At approximately [redacted] hours the CI left 806 W. 11th and met with Agents. Agents then met with the CI at a predetermined undisclosed location and collected the crystalline substance. Agent Brackeen then searched the person of the CI with no drugs, money or weapons being found. Agents learned from the CI that [Defendant] had weighed the meth in the truck. That [Defendant] had travelled to an unknown location to get the meth.
>
> Agent Salas conducted a field test using the Tru-Narc device and the device indicated the crystalline substance was [m]ethamphetamine.

(Doc. 117-9) at 1-3.

On June 11, 2018, members of the Chaves County Metro Narcotics Task Force stopped Defendant and searched him and the Toyota truck with New Mexico license plate LDN-973. (Doc. 119) at 2. Agents found in the truck "approximately 5 ounces of methamphetamine in a baggie concealed in the truck, two firearms, and one cell phone." (*Id.*) at 3-4.

Also, on June 11, 2018, Agents executed search warrants for 1500 W. Albuquerque Street, 315 E. Forrest Street, and 806 W. 11th Street. (Doc. 42) at 3. While some firearms were found in a shed at one of the residences, these warrants and any items discovered pursuant to these warrants are not at issue in the Second Motion to Suppress. (Doc. 119) at 1-2.

On July 10, 2018, the United States indicted Defendant in this case for allegedly possessing 50 grams and more of mixture and substance containing a detectable amount of methamphetamine with the intent to distribute it, and knowingly carrying a firearm during the commission of that crime. (Doc. 16) at 1-2. On April 17, 2019, the United States filed a Superseding Indictment against Defendant for allegedly possessing 50 grams and more of methamphetamine with the intent to distribute it, and knowingly possessing a firearm in furtherance of that crime. (Doc. 88) at 1-2.

The United States filed an unopposed motion to continue trial on April 19, 2019, citing recent developments in the case. (Doc. 91). Specifically, the United States received information on April 18, 2019, that Chaves County detectives were investigating Agent Juarez based on allegations and reports that Agent Juarez was using cocaine and was possibly involved in sexual or otherwise inappropriate relationships with CIs, including the CI in this case. (*Id.*) at 1-2. Agent Juarez was alleged to have sent flirtatious, sexually explicit, and otherwise inappropriate and unsolicited text messages to CIs, including the CI in this case. (Doc. 109) at 2; (Doc. 119) at 4.

During the Chaves County investigation, which began in February 2019, Agent Juarez made an unprompted statement that he had been using cocaine for six months. (Doc. 109) at 2. This places Agent Juarez's initial use of cocaine sometime in August 2018.

The relevant CI began working for Agent Juarez in approximately May 2018. (Doc. 119) at 4; (Doc. 117-7) at 5. He or she had been arrested with an ounce of something and was acting as a CI in hopes of leniency in the then-pending state case. (Doc. 117-6) at 4; (Doc. 117-8) at 25, 27. The CI never signed a contract with the district attorney's office. (Doc. 117-6) at 3. All

told, the CI estimates that Agent Juarez paid him or her over $1,000 to conduct controlled buys. (Doc. 117-7) at 7.

The CI has been interviewed multiple times and denies ever meeting with Agent Juarez alone and denies engaging in a sexual or other inappropriate relationship with him. (Doc. 109) at 2-3; (Doc. 117-6) at 7, 15; (Doc. 117-7) at 13, 15, 23; (Doc. 117-8) at 15.

The CI told investigators that Agent Juarez sent him or her inappropriate messages "sporadically," but could not recall when the messages began. (Doc. 117-6) at 9-10. Available and produced text messages show that Agent Juarez sent the CI inappropriate text messages between January 14, 2019, and February 22, 2019. (Doc. 117-2). He or she stated that there were some inappropriate text messages before January 14, 2019. (Doc. 117-6) at 14. However, the CI told federal agents that the messages started "a while" after he or she began working with Agent Juarez, rather than very early in the CI relationship. (Doc. 117-8) at 11. The CI further stated that Agent Juarez never sent him or her inappropriate pictures and he or she never sent Agent Juarez inappropriate pictures. (Doc. 117-6) at 8; (Doc. 117-7) at 17; *see also* (Doc. 117-8) at 11, 13. The CI said that he or she "thought it was inappropriate, but I thought he was just, like, joking around. I didn't – you know what I mean?" (Doc. 117-6) at 21; *see also* (Doc. 117-8) at 9. He or she told investigators that Agent Juarez "hit on" him or her, but that he or she never "hooked up" with Agent Juarez. (Doc. 117-6) at 6. The CI said that the inappropriate messages stemmed entirely from Agent Juarez, and that the CI "strictly was working." (Doc. 117-7) at 21; *see also* (Doc. 117-8) at 11.

While speaking with an internal affairs investigator, the CI said that Agent Juarez would sometimes text him or her saying that Agent Juarez had a warrant for his or her arrest. (Doc. 117-7) at 9, 11. Agent Juarez never propositioned the CI to resolve the alleged warrant, and the

CI would respond "[t]here's no way you could have a warrant for my arrest. I haven't done nothing." (Doc. 117-7) at 11. Agent Juarez would then say he was just kidding and would ask the CI for information. (Doc. 117-7) at 11.

The CI told the internal affairs investigator that Agent Juarez never asked him or her to "do anything that didn't seem right that maybe wasn't sexually related" but was "anything that [the CI] thought, well, that doesn't seem right for a cop to be asking for that." (Doc. 117-7) at 17. The CI said that Agent Juarez's requests were always to conduct a drug buy and then report back. (Doc. 117-7) at 17. In response to questions from federal agents, the CI expressly denied that Agent Juarez ever remarked on targeting a specific person or conducting investigations in a way that looked illegal. (Doc. 117-8) at 23, 25 ("ATF: Okay. But he never, like, asked you to go out there and target anybody that wasn't already conducting drug deals or some guns or anything? CI: No."), 31 ("ATF: . . . [Agent Juarez] never said -- illegally or try and entrap this person or anything? CI: No. He never -- he never asked me to do anything like that.")

The CI denied supplying Agent Juarez with drugs, other than in a CI capacity. (Doc. 117-6) at 7; *see also* (Doc. 117-8) at 15 (denying doing drugs with Agent Juarez; stating Agent Juarez always had another officer or agent present when the CI returned from a buy). Furthermore, the CI stated that he or she never saw Agent Juarez do anything illegal. (Doc. 117-7) at 23; (Doc. 117-8) at 19; *see also* (Doc. 117-8) at 15 (denying doing drugs with Agent Juarez).

II. Analysis

In his Second Motion to Suppress, Defendant asserts that the search warrant lacked probable cause because it failed to set forth sufficient evidence to demonstrate the CI's knowledge and reliability, lacks factual foundation supporting a nexus between the Toyota truck

7

and the items to be seized, and was fatally overbroad. (Doc. 119). Furthermore, Defendant argues the good faith exception does not apply because the warrant affidavit was so deficient that no reasonable officer could rely on it. (*Id.*) Finally, Defendant requests a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), on the basis that Agent Juarez knowingly or with reckless disregard omitted information in the warrant affidavit that the CI was too new to be deemed reliable, that Agent Juarez had accused the CI of not transmitting important information, and because Agent Juarez "recklessly failed to investigate in order to corroborate the informant's allegations." (Doc. 119) at 21.

A. *Factual Foundation for the CI*

Defendant first argues that the warrant affidavit conclusorily describes the CI as "reliable," but fails to describe the CI's past performance or indicia of reliability. (Doc. 119) at 7-8. Furthermore, the CI worked for Agent Juarez for only a matter of weeks before Agent Juarez obtained the search warrant at issue on June 7, 2018, which was insufficient time for the CI to prove reliable. (*Id.*) at 8. This failure, Defendant argues, renders the search warrant for the Toyota unsupported by probable cause.

When evaluating whether probable cause exists to support a search warrant, courts must make "a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before [the judge], including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). "In assessing whether a search warrant is supported by probable cause, a magistrate's determination of probable cause must be given considerable deference." *United States v. $149,442.43*, 965 F.2d 868, 872 (10th Cir. 1992) (citing *Gates*, 462 U.S. at 236). The court "need only ask whether,

under the totality of the circumstances presented in the affidavit, the magistrate judge had a 'substantial basis' for determining that probable cause existed." *United States v. Artez*, 389 F.3d 1106, 1111 (10th Cir. 2004) (citing *Gates*, 462 U.S. at 238-39).

The United States Supreme Court adopted a "totality of the circumstances" test to determine when information from a CI can establish probable cause. *Gates*, 462 U.S. at 238. The Court explained that an informant's "veracity, reliability, and basis of knowledge are all highly relevant in determining the value of his report." *Id.* at 230 (internal quotations omitted). However, "a deficiency in one [factor] may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." *Id.* at 233. Specifically, "[w]hen there is sufficient independent corroboration of an informant's information, there is no need to establish the veracity of the informant." *United States v. Danhauer*, 229 F.3d 1002, 1006 (10th Cir. 2000); *see also Artez*, 389 F.3d at 1111 (quoting same).

"A tip from an anonymous or confidential informant that narcotics are being distributed at a particular location may be corroborated through the arrangement of a controlled purchase at the suspect location." *Artez*, 389 F.3d at 1111. The usual and accepted processes for conducting a controlled purchase or controlled buy are as follows:

> the police search the informant (and his vehicle, if appropriate) for money and contraband prior to the buy; give the informant money with which to purchase the narcotics; transport the informant to the suspect residence (or follow the informant to the residence); watch the informant enter the suspect residence, disappear while inside the suspect residence, and emerge from the suspect residence; search the informant upon exiting the suspect residence; and receive the narcotics from the informant.

*Id.* at 1111-12 (footnote and citations omitted). "[T]he absence of constant visual contact with the informant conducting the transaction does not render a controlled purchase insufficient, nor does the absence of audio-recording of the transaction." *Id.* at 1112.

In this case, Agent Juarez attested to being a certified law enforcement officer with over eight (8) years of law enforcement experience. (Doc. 119-1) at 4. Agent Juarez attest that the CI reported witnessing Defendant sell methamphetamine from his vehicle, a white Toyota truck. (*Id.*) Agent Juarez further set forth his opinion on how drug dealers operate, based on his training and experience. (*Id.*) at 5. Then, "during a controlled buy through surveillance," Agents observed the white Toyota truck bearing New Mexico license plate number LDN-973 travel between residences while driven by Defendant. (*Id.*) at 5. Finally, Agent Juarez stated that the "informant was able to purchase methamphetamine from [Defendant, and] Agents learned from the informant that [Defendant] had travelled to an unknown location to pick up methamphetamine." (*Id.*)

The affidavit does not explain how Agents knew the driver to be Defendant or how they recognized Defendant. Though Defendant makes much of this oversight, the affidavit makes clear that the Toyota truck and at least one of the subject residences were registered to Defendant. Furthermore, the affidavit does not expressly detail the controlled purchase process outlined in *Artez*. Instead, Agent Juarez appears to have used the shorthand description of "controlled buy through surveillance" to describe the process.[2]

Though these minor deficiencies muddy the analytical waters, the analysis governing issuance of a warrant for the search of a place is "whether the facts presented in the affidavit

---

[2] Notably, the Supplemental Report (Doc. 117-9) explains the *Artez* process for conducting the controlled buy. While this Report corroborates the information contained in the affidavit, it was not before the issuing judge.

would warrant a man of reasonable caution to believe that evidence of a crime will be found at the place to be searched." *United States v. Nolan*, 199 F.3d 1180, 1183 (10th Cir. 1999) (internal quotation omitted); *see also Gates*, 462 U.S. at 238 (explaining probable cause exists if affidavit demonstrates "a fair probability that contraband or evidence of a crime will be found in a particular place")).

The CI's purchase of methamphetamine from Defendant while Agents surveilled Defendant's movements, and Agents' observations matched up with the CI's description of events, supported Agent Juarez's suspicion that methamphetamine would be found in Defendant's vehicle. Agents' observation of Defendant operating the vehicle provided a reasonable connection to Defendant personally. The Court concludes that the controlled purchase of methamphetamine from Defendant and his truck corroborated the CI's tip that the Defendant was selling methamphetamine from his vehicle.

Certainly this information did not eliminate the risk that the CI was lying or simply wrong. That risk need not be entirely eliminated. "Rather, what is needed is that the probability of a lying or inaccurate informer has been sufficiently reduced by corroborative facts and observations." Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment*, § 3.3(f), at 168 (3d ed. 1996). Viewing the totality of the circumstances, the Court concludes that the information submitted in the affidavit sufficiently reduced that probability.

B. *Nexus between the Toyota and Items to be Seized and Breadth of the Warrant*

Next, Defendant argues that the affidavit lacks sufficient facts to link the Toyota truck with the items to be seized. (Doc. 119) at 11-12. That is, Defendant contends the affidavit fails to demonstrate a nexus between the crime allegedly committed and the place to be searched. (*Id.*) (citing *United States v. Nolan*, 199 F.3d 1180, 1183 (10th Cir. 1999)). Similarly, Defendant

11

asserts that the warrant is fatally overbroad by authorizing seizure of "virtually every piece of paper in the truck." (*Id.*) at 14.

"[T]he Fourth Amendment commands that 'no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.'" *United States v. Sells*, 463 F.3d 1148, 1153 (10th Cir. 2006) (quoting U.S. Const. amend. IV). The Tenth Circuit explained:

> The particularity requirement is satisfied when the description of an item to be searched for and seized pursuant to a warrant enables the searcher to reasonably ascertain and identify the things authorized to be seized. Even a warrant that describes the items to be seized in broad or generic terms may be valid when the description is as specific as the circumstances and the nature of the activity under investigation permit. However, the fourth amendment requires that the government describe the items to be seized with as much specificity as the government's knowledge and circumstances allow, and warrants are conclusively invalidated by their substantial failure to specify as nearly as possible the distinguishing characteristics of the goods to be seized.

*Id.* at 1154 (quoting *United States v. Leary*, 846 F.2d 592, 600 (10th Cir. 1998) (internal quotation marks, citations, and footnote omitted)); *see also United States v. Webster*, 809 F.3d 1158, 1165 (10th Cir. 2016) (quoting same). "When the circumstances of the crime make an exact description of the fruits and instrumentalities a virtual impossibility, the [attesting] officer can only be expected to describe the generic class of items he is seeking." *United States v. Harris*, 903 F.2d 770, 774 (10th Cir. 1990) (quotation omitted).

In this case, the warrant expressly adopted the affidavit and authorized the seizure of:

> Controlled substances kept in violation of the laws of [New Mexico], namely [m]ethamphetamine; implements used in the commission of the offense of possession and delivery of controlled substances, to wit: any drug paraphernalia to plant, propogate [sic], cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, weigh, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale or otherwise introduce into the human body a controlled substance in violation of the controlled substance act. Any items used to facilitate distribution or protection of controlled substances to include but not limited to: scanners, video surveillance equipment, cellular phones, pagers or

firearms. Any records relating to the transporting, ordering, purchasing, manufacturing and or distributing of controlled substances to include, but not limited to: pay/owe sheets, customer lists, phone lists of conspirators in the delivery and sale of controlled substances, telephone bills, cellular phone bills, written records, records stored in electronic form on computers, USB drives, hard drives, floppy disks, computer disks, cellular phones (to include information stored in the cellular phone to include text messages, contacts, call logs and photographs) and any other device capable of storing electronic or digital information, vehicle rental receipts. Proceeds of illegal drug trafficking including, but not limited to: cash, currency, jewelry, weapons, pawn tickets and any other item of value received in exchange for illegal drugs. Any financial documents, including but not limited to credit card statements, tax returns, safe deposit records, safe deposit keys, bank records, bank statements, money orders, checking account records, cashiers checks and any other items evidencing the obtainment, concealment and or expenditure of money.

(Doc. 119-1) at 4. Part of the support for this list of items comes from Agent Juarez's description of drug trafficking operations, based on his training and experience, as described above. (*Id.*) at 5.

"The type of criminal activity under investigation in the present case—drug dealing—made it difficult to list with any greater particularity the [items] desired to be seized which evidences such activity." *Harris*, 903 F.2d at 775. While the list of items to be seized is broad and general, all of the items are tied to drug trafficking, specifically methamphetamine, by context of the warrant and by Agent Juarez's training and experience in law enforcement. Furthermore, the controlled buy and the CI's statements indicated that Defendant sold methamphetamine, that is, distributed methamphetamine, from his Toyota truck. Agents verified that the truck belonged to Defendant and observed his conduct during the controlled buy to be consistent with the CI's description.

Under the totality of circumstances, probable cause supported issuance of the warrant to search the Toyota truck for items related to distributing methamphetamine and to seize the

particular categories of items described above, all relating to methamphetamine distribution. Therefore, the warrant was not fatally overbroad.³

C.  *Warrant Veracity and* Franks *Issue*

Finally, Defendant requests a *Franks* hearing on the basis that Agent Juarez knowingly or with reckless disregard omitted relevant information from the affidavit that would, if included, undermine the probable cause determination. (Doc. 119) at 16-21.

Under *Franks*, a defendant may raise a Fourth Amendment claim by challenging the veracity of a search warrant affidavit under specific, limited circumstances. There are two parts to the *Franks* analysis. First, the search warrant affidavit is presumed to be valid, but a defendant is entitled to an evidentiary hearing concerning its veracity if the defendant sets forth "allegations of deliberate falsehood or of reckless disregard for the truth," which "must be more than conclusory and must be supported by more than a mere desire to cross-examine." *Franks*, 438 U.S. at 171.

> The defendant's allegations:
>
> must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the *affiant*, not of any nongovernmental informant.

*Id.* (emphasis added). The Tenth Circuit has emphasized that speculation alone is insufficient to entitle a defendant to a hearing under *Franks*; there must be "*evidence* that the allegations of the affidavit are false." *United States v. Long*, 774 F.3d 653, 662 (10th Cir. 2014). Further, the

---

³ Because the Court concludes the warrant was supported by probable cause and was not fatally overbroad, the Court does not address Defendant's argument regarding the good faith exception found in *United States v. Leon*, 468 U.S. 897 (1984).

United States Supreme Court in *Franks* explicitly recognized that there might be facts in a search warrant affidavit that are not "necessarily correct," that but those facts must be "believed or appropriately accepted by the *affiant* as true" to pass muster under the Fourth Amendment. *Franks*, 438 U.S. at 165 (emphasis added). In other words, the question in a case like this is whether Agent Juarez lied about the CI's "existence or statements, or knew that the informant was lying." *United States v. Williams*, 576 F.3d 1149, 1162 (10th Cir. 2009).

Second, if the defendant meets the above requirements, the Court must then set aside the material "that is the subject of the alleged falsity or reckless disregard," or include necessary but omitted information, and consider whether the affidavit would still support a finding of probable cause to conduct the search. *Id.* at 171-72. The Court "must ask whether a warrant would have issued in a but-for world where the attesting officer faithfully represented the facts." *United States v. Herrera*, 782 F.3d 571, 575 (10th Cir. 2015). If the search warrant affidavit still supports a finding of probable cause without the false statements, no *Franks* evidentiary hearing is required. *See Franks*, 438 U.S. at 172. However, if the search warrant affidavit does not support a finding of probable cause with the false statements excised, then the defendant is entitled to a *Franks* evidentiary hearing. *Id.*

Defendant argues that Agent Juarez omitted the CI's length of service, including that the CI was very new and "was under pressure to prove . . . reliability and [Agent Juarez] was apparently seeking to have an affair" with the CI. (Doc. 119) at 17. Defendant further asserts that Agent Juarez "recklessly failed to investigate in order to corroborate the informant's allegations, failed to include sufficient information from which the magistrate could actually determine the reliability of the informant, and recklessly omitted material information that undermined the reliability of the informant." (*Id.*) at 21.

15

The only challenge that Defendant truly raises is to Agent Juarez's characterization of the CI as reliable. Defendant does not argue the CI had not conducted controlled buys for Agent Juarez in the past, and does not argue that the CI had not been reliable in the past. Indeed, Defendant simply asserts that the CI was too new to be deemed reliable. The Court is not persuaded.

Furthermore, as discussed above, issues related to the CI's reliability were mitigated by the controlled buy. Notably, Defendant takes umbrage with Agent Juarez's description of the controlled buy, but does not assert that Agent Juarez lied about it or otherwise misrepresented the circumstances or events. Even if the Court considered the search warrant affidavit without Agent Juarez's attestation to the CI's history of reliability, the affidavit still supports probable cause to search the Toyota truck and the Defendant's person based on Agents' observations during the controlled buy and the corroboration of the CI's statements. Furthermore, the Supplemental Report corroborates and further supports Agent Juarez's representation of the controlled buy in the affidavit.

The Court is very troubled by the allegations against Agent Juarez. If proven, the allegations call into question Agent Juarez's truthfulness and credibility and suggest an abuse of power. However, the allegations at issue arose well after the affidavit and search in this case.

In analyzing this issue, the Court considers the affidavit and information surrounding Agent Juarez's attestation thereto. The evidence produced by the parties suggests that Agent Juarez began using cocaine no less than two months after signing the affidavit in this case. Furthermore, the CI told investigators that he or she began working as a CI around May 2018, and that Agent Juarez's inappropriate – but unreciprocated – conduct began "a while" after that, and not "very, very shortly" after the CI began working.

The Court certainly agrees the allegations are disturbing but also finds they stem from actions and events that occurred after the affidavit at issue. As such, these distressing allegations do not rise to the level of calling into question this affidavit.

To be clear, the Court does not hold that no such affidavit could be called into question based on the allegations and evidence presented. However, under the specific facts and circumstances of this case, the evidence shows that Agent Juarez's allegedly dishonest behavior began after execution of this affidavit. Defendant presented no evidence for this Court to conclude Agent Juarez intentionally, knowingly, or recklessly included false information in the affidavit, nor that he intentionally, knowingly, or recklessly omitted material information from the affidavit such to hold a *Franks* hearing.

III. Conclusion

For the foregoing reasons, the Court concludes that probable cause supports the warrant and that the warrant is not fatally overbroad. Additionally, Defendant has not presented evidence that Agent Juarez lied or knew the CI was lying when Agent Juarez executed the search warrant affidavit. Even if the Court were to so conclude, the affidavit still supports a finding of probable cause to search the 2008 Toyota for drugs and related objects. Defendant is not entitled, therefore, to a *Franks* evidentiary hearing. Consequently, the Court denies Defendant's Second Motion to Suppress.

UNITED STATES DISTRICT JUDGE